They are In Re. Bryan, Appeal 1461 from 2008, and Araro v. Office of Personnel Management, Appeal 3029 from 2009. On the argument list, we'll hear argument first in Crater Corporation v. Lucent Technologies, Appeal 1289 from 2008. Mr. Schultz, good morning to you. Welcome to the court. Good morning, Your Honor. Please proceed. Yes, sir. My name is Rob Schultz. I have the honor of representing Crater Corporation, and I have the pleasure of being the victim of a summary judgment that was not just unsupported by undisputed facts, but is contrary to them. Crater Corporation was a small company of, at the time, three people, three engineers, who invented what's called a coupler. We know the facts. They were well rehearsed in the briefs. Where is the error in the district judge's rulings? I read the opinion over and over. It was hard for me to see where there is a reversible error there. Sure. Well, Judge, the first point was this case involves either one agreement with four terms to it or four agreements. The first agreement was that AT&T and Lucent would use the information Crater provided for research and development, and that there would be no sale of a device with a Crater coupler in it. That is undisputed in the record. It is also undisputed that AT&T and Lucent sold wet-mates with Crater couplers. That's from the testimony of Mr. Nagengast. So the first point is... Well, forgive me for interrupting, but on that point, the district court didn't give much credence to that testimony. The district court concluded that really didn't raise a genuine issue of material fact. I agree. That's what the district court said. The strange thing is, Mr. Nagengast is one of the defendant's witnesses, and he testified flat out that wet-mates with Crater couplers were sold to the government. And I've quoted his testimony in my brief. How can that be? The government rejected the design and didn't want to buy any production models for use under the ocean. So it's obviously a semantic confusion and imprecision by the witness when he says they were sold. Well, the defense has also used that in various motions under the state's secret privilege earlier in the case. So the defense has never contended that they were not sold. They have based earlier motions on Mr. Nagengast's testimony that the Crater couplers were only sold to the government. Now perhaps when they put forth that testimony, they did not realize it would be creating a breach of contract here. But the truth, as testified to by defense witnesses, is wet-mates with the Crater coupler were sold to the government. Yes, sir. You may argue anything you like, but it sounds very far-fetched to me. The understanding was there was a research and development contract between the Navy and Ellucent and its partners, and there were several technology advisors, including your clients who were providing some technology that Ellucent and its partners might provide to the government. And if accepted, there would ultimately be a sale of actual usable couplers to the government. And so I understand that the only ones that were made and supposedly sold to the government were described variously as brass board or breadboard preliminary models. And it seems to me that that's clearly not a breach, because that's not what the parties contemplated. Well, Judge, two things. When the parties made the agreement of no sale, it was no sale. My clients had no idea when they were cooperating with Ellucent and providing them technology that Ellucent was selling the couplers and getting paid for them. That was beyond the ken of my clients. And it was only afterwards that we learned that, yes, Ellucent was paid for this and sold them. So the first point, Judge, and the other... Even if the sale, even if there was a passing of money in the setting of the R&D effort, that still amounts to a breach of contract. Yes, sir. And one handicap I have, Your Honor, is this case, I don't mean to tell you what was done before, but on the second appeal, this case was remanded to determine whether I'd get any discovery. And with the judge's decision below, I have very little discovery based on the state secret period. That's not before us, is it? No, Judge, but when you ask me questions about the terms of the agreement between Ellucent and AT&T and the government and what went on beyond the testimony I've repeated to you, AT&T and Ellucent and the government have not allowed me to learn more of the details. So when Ellucent... My client and Ellucent, not the agreement between Ellucent and the government. I agree, Your Honor, but in the agreement, the first agreement between my client and Ellucent... You can't argue that this summary judgment is reversed because you didn't get all the discovery you would have liked to get because there's no discovery issue presented in this appeal. No, Judge, I'm not arguing that. I'm merely pointing out that the first agreement between my client and Ellucent was that there was going to be no sale. And then later on, we find, according to Ellucent's own witnesses, there were sales. And that's just point one. The only witness is Mr. Nagengast. Yes. Because the other witnesses, it's Mr. Nagengast. Yes. And his testimony is, as the district court pointed out, not as clear as it would seem because the statement that you refer to about how many were sold, all of them, was preceded by a statement that where he was asked, do you draw a distinction between a device you might make in your lab sort of to try to get it right and then a device that you actually sell to a customer, answer no. That raises a serious question of whether his answer to questions subsequently is sufficient to raise a genuine issue of material fact. Well, defendants have never asserted that the devices were not sold. In fact, I'm looking at page, it's in the record, 2278. That's Mr. Nagengast's testimony that you're referring to, Judge. And I asked him how many of these couplers were made. He said approximately 30. And I asked him how many were sold to the government. He said all of them. And then, as you can see, I tried to ask a little more about the terms of the sale, which would give me more backup to the testimony that they were sold and the objections were raised. These aren't even devices. These are breadboard mock-ups. You can't use these to couple cables under the ocean, which is what the Navy ultimately was trying to procure. Judge, I don't know the answer to that question. I know they were sold to the government. The Navy apparently decided they weren't going to mass produce them. My point is that the thing given to the government was a breadboard preliminary design. The agreement, if there was one, had to do with usable devices being sold to the government, as I interpret it. I understand your point. I'll merely point out that you've gone into areas where I have not been allowed to go with regard to, I've never been allowed to see the couplers that were sold to the government. I know that AT&T and Lucent have claimed they were only breadboard couplers. At the same time, they claim they were manufacturing them in the Carolinas through a company called Unique Tool. So there is contrary evidence to the assertions made by the defense that these were only R&D, especially when they're being sold. Now I understand, Your Honor, that there's a question of fact there. However, that's a question of fact not for me, not for them, and not for the District Court. It would be for the jury. The jury could conclude that based on Mr. Nagengast's testimony, that they were sold because that's exactly what Mr. Nagengast testified to. Do you want to cover the other agreements? I would, Your Honor. Because we're running very short on time and I think we're being repetitive. We understand your argument. You're saying they were sold and what was sold was what was not to be sold and therefore summary judgment is not right. Okay, what about the other two? The other argument was that there was a promise made to provide us with CAD CAM information. The defendants asserted that that promise was unsupported by consideration. We don't care what the defendant asserted. The court found that there was no contract because there was no consideration. Yes, and that finding is not just contrary to the undisputed facts. Well, it's contrary to the undisputed facts. One, we have testimony from Mr. French of the agreement. Second, the reason the court said it found there was no contract is based on lack of consideration, which is first, inconsistent with Mr. French's testimony that he was providing information to Lucent after October of 95. The defense says, well, no information was provided to Lucent after October 95. There is no citation to that statement. It does not show up in their undisputed facts. I don't understand your point. The court ruled no consideration because Lucent got no benefit from any agreement to provide drawings, etc. back to your client. And the consideration they received, according to Mr. French in his deposition, was further information from my client. And the assertion was made by the defendants that there was no consideration because no information had been procured after October 95. There's no citation to that. It's not in the record. And it's inconsistent with Mr. French's testimony where he said he was providing information after that. Okay, that's the second agreement. How about the third? We're already in your time, so I'm trying to help you here. The other agreement was that they would not disclose the information we gave them to others. They disclosed it to General Dynamics when they sold this division. They disclosed it to Unique Tool when they made these greater couplers. And I suppose they disclosed it to the government, too. So those are the breaches of the agreement not to disclose information. How can it be contemplated by your client that in Lucent's relationship with the government, it's not going to pass on the technological information that Lucent is getting from your client? That's absurd. There would be no use for it. There would be no point in there being any transmission by anybody to anybody else of technological information if it can't be passed on to the government. We've got to use a little common sense here. I agree, Your Honor, and that's why the first two points are the ones I'm relying on, which is, one, that the disclosures were made to Unique Tool without the knowledge of my client, and that this division of Lucent, which had this information, was later sold to General Dynamics. The fourth point is that I'd like to move to the submission of ideas tort, which the court rejected saying that the New Jersey law submission of ideas requires a public sale. The submission of ideas tort in the New Jersey law requires three things. It requires a novel idea given under confidential circumstances, and it must be used by the defendant. In this case, we have the novel ideas, many of them documentary before the court. We've got the agreements to keep it confidential, and three, we've got the testimony of Mr. Ruminski that he actually used this information in his work at Lucent and AT&T. But that use was in connection with R&D, which was permitted, was it not? It was. As R&D, yes. As sales and disclosure, no. But as R&D, it was permitted, so you can't argue that that is a breach of contract when it was specifically authorized. I agree with you that that particular portion of it was authorized. Our assertion was that this use was made outside of our agreement. For instance, the disclosure to others, the manufacture by other people. Remember, there was an agreement they would only make them at Whippany. They ended up making them at Unique Tool down in the Carolinas, and that there were sales of them without a license agreement. You're correct that if all I had was the R&D, you would be absolutely correct. However, the point is they violated the agreement, the conditions of confidentiality, and in order for the district court to find against me on this point, the district court had to create a new rule under New Jersey law that to bring a submission of ideas toward claim, you have to have a public sale. That was the word used by the court. There is no such standard in New Jersey. Violent, harmless error in this case when the use of the ideas seemed so plainly to be within the contemplation of the partners in this arrangement. I can tell you, Judge, it was not within the contemplation of the three engineers at Crater Corporation who believed... The contemplation that counts is the mutual agreement of the parties on both sides of the alleged contractor exchange, not the subjective belief or hope of your clients. I agree with that. The objective agreement was there would be no sale, there would be no disclosure, and they would only be made in Whippany. Those three things I've told you are undisputed under the record before us, and the defense has not put forward any affidavits or sworn testimony that those agreements were not just as I said. All right, let's hear from the other side. I'll give you a couple minutes of rebuttal, Mr. Schultz. Mr. Marshall, pointing to you. Good morning. May it please the court, Lee Marshall for the defendants. The district court in this case gave Crater every opportunity to make out its best case, even allowing it to proceed on a claim that it did not plead. When this case was remanded, it was for determination of the trade secrets and contract claim. Came back down, we filed summary judgment on those claims, and Crater abandoned its trade secrets claim, came up with a submission of ideas claim. All of these state law claims failed on state law grounds. I want to address the first alleged contractual agreement that the defendants would not sell any devices containing Crater technology to anyone. And Mr. Schultz said just now that the defendants admitted that there was a sale and never argued that there wasn't one. And I'm looking at page A1598, which is our summary judgment brief, where we say, and I quote, as to Crater's claim that Lucent sold wet mates with the Crater coupler or used Crater's technology other than for research and development, Crater does not offer evidence to support this claim. We clearly argued that there was no sale. And in fact, Judge Lynn is correct that Mr. Nagengast, while he did use the word sold, also earlier in his testimony clearly said that he was not making a distinction between the type of research and development to figure out whether it worked or an actual sale to a customer. But you know, we are addressing a summary judgment determination. So the question here is whether there's a genuine issue of material fact on this point. Clearly there is testimony from Mr. Nagengast that, according to his testimony, there were 30 or so of these things. How many of these were sold to the government? All of them. Nothing ambiguous about that. Why does that not create a genuine issue of material fact as to the sale? Because two questions earlier, he says he's not making a distinction between a device that you would make in your labs sort of to try to get it right and a device that you actually sell to a customer. That's why it doesn't create a question of fact. I realize that, but that question is a little bit unusual. I'm not sure exactly what it means. He says he's not making a distinction, but I don't know what that means and I don't know how that in any way relates to his subsequent testimony about the sale. But the point is, isn't that kind of question about whether his answers jive or conflict, isn't that the stuff of fact determination? I think what Mr. Nagengast was saying, or the way I read his testimony, is that the devices that Lucent was making under the government research and development contract were government property. They were prototypes made for the government. They were government property. Now, you compare that testimony to Crater's witness, Phil French. He was not aware of anything beyond research and development. Lucent's Paul Romanski. All of the couplers were in the brass board category. And then the certification from the government, where the government certified, and this is page A1893 of the record, that a total of 36 brass board slash prototype engineering development units coupling devices were made. These units were tested and evaluated and failed to meet fully the government's requirements. That was a certification from the government. These were research and development units only. It was squarely within the scope of the alleged agreement. Under the research and development contract, Lucent gets paid. Tell me how they get paid. They get paid just for doing research and development over a given period of time and providing reports? Your Honor, I would presume that that would be the case. The contract is not in the record. The government asserted the privilege with respect to that. The only thing we know about the contract is that it contained an authorization and consent clause, which is why the patent claims are no longer in the case. With respect to the agreement to provide drawings, I was somewhat surprised that Mr. Schultz is now arguing that, in fact, that there was consideration for this request for the drawings, because that's not an argument that was raised in his brief. The only argument that was raised in his brief was that this was an affirmative defense that Lucent did not plead. In fact, the drawings that were requested all related to information that Crater had already provided, and that's quite clear from the record. That's what the district court found. Now, with respect to the argument that this was an affirmative defense, all of the cases that Crater cites- Arguments he made in his brief, you responded to in your brief. Arguments he didn't make here orally, you don't need to respond to orally. Very good, Your Honor. I understand. The third agreement-well, Mr. Schultz did not get into the third agreement with respect to the transfer of information. Let me address the submission of Ideas Claim. We agree that if there's no sale of the device, that this claim collapses under its own weight. What does that mean, collapses under its own weight? That just sounds like rhetoric. What's the legal logic? Let me clarify what I meant by that. What I meant is that there was an express agreement to allow Lucent to do research and development. Crater can't come in and say that there's an implied contract, which is what a submission of Ideas Claim really is, that they wouldn't use the information for research and development. The only way that you can get to submission of Ideas is if there's somehow determined that there was something beyond research and development. That's my point with respect to that. Mr. Schultz mentioned the evidence regarding that some of the coupling devices were made at Unique Tool in North Carolina. That aspect of Crater's contract claims, the district court did not determine. We were entitled to summary judgment on. He was prepared to let those go to trial, but Crater dismissed those claims in order to take this appeal and have agreed not to reinstitute those claims if this case is affirmed. So there's Unique Tool and the agreements that relate to that are simply not in this case. I ask an irrelevant question here just to get the context a little better. Counsel for both parties are from Missouri. Yes. Lucent's in New Jersey. I forget where Crater is from, but I'm trying to figure out why two litigators from eastern Missouri are litigating this case for some particular parties before us. What's the short answer to that? I think the short answer to that is Crater filed in the eastern district of Missouri. And why they made that decision, you would have to ask Mr. Schultz. If there are no further questions, I'm prepared to sit down. Thank you. Thank you. Mr. Schultz, three minutes for rebuttal. We filed in the eastern district of Missouri because one of the three inventors was my brother-in-law. This is a brother-in-law case. I'm sure as attorneys we've all had them before. In fact, Your Honor, this case has been going on so long it's become an ex-brother-in-law case. So that is the reasons, Judge. A few points that came up. One is the assertion was made we abandoned our trade secret argument. No, under New Jersey law, trade secrets have developed differently than other states. The submission of ideas is a subset of the trade secrets law. It's a very liberal trade secrets provision. But it's part of trade secrets law both according to U.S. District Court decisions out of New Jersey and according to treatises which talk about it. Most states have enacted the Uniform Trade Secret Act. New Jersey has not. And so their trade secret law has proceeded under the common law. And we have the submission of ideas. Two, I'd like to point out that sold means sold. Oh, yes, sir. In response to his argument that there was a fatal conflict between the idea of a research project and the kind of total secrecy contemplated by the New Jersey tort. Well, the New Jersey tort does not contemplate total secrecy. In fact, it's quite broad. It just requires the information not to be widely known. Second, the idea that you can share information with someone for them to do research and development and put limitations on them, which was done here. And they violate those limitations. They violated the permission you've given them. For instance, as defense counsels noted, there were several smaller violations of the contracts, which the district court found there was a disputed issue of material fact. They're not before us. No, but they are before us, Your Honor, with regard to the submission of ideas claim. Earlier you mentioned to me that if they were allowed to do R&D, they had permission to do that, then how can they violate the tort? If they have permission, yes. But even the district court found they may have gone beyond their permission with regard to where they made them whippany, beyond whippany, and whether they shared the information with others. Those two things, even the district court found there's a disputed issue of material fact. That would indicate there's a disputed issue of material fact with regard to the tort of submission of ideas. Since that, even the district court found that defendants may have gone beyond the permission they were given. There was also the mention of 36 of these crater couplers being made. I might as well mention to you it came up in an earlier appeal that later on defendants admitted they made more than 50 of them. What happened to the other 14, 15, 16 has never been explained to me. The government acknowledged around 36. The lack of consideration argument was an affirmative fence never pled, should not have been ruled upon by the district court. Well, why isn't it the burden of he who is alleging breach to prove there was a contract, and part of proving there was a contract is to prove that there was consideration. It is. Well, how is it wholly his burden? It seems like it's your burden. Well, it is my burden to prove it, but for summary judgment, it is the movement's burden to show he's entitled to summary judgment by an undisputed issue of material fact. Well, I'm aware of the law. So are the other members of the panel. It's very basic law. And I would just like to point out that there is no undisputed issue of material fact on the consideration point. In other words, defendants have no evidence that there is a lack of consideration. It's defendants who have to have some evidence even to get the motion forward. Aside from the fact they never pled it and it should not have been a basis for the district court's ruling. Anyway, I'd like to ask the court to reverse the district court's judgment because it was based on either a misreading of facts or, as Judge Lin has pointed out, various findings of fact by the district court in which my client was entitled to the inferences. And, in fact, the inferences were found against my client. Thank you very much. All right. Thank you, Mr. Schultz. And we thank you, Mr. Marshall, as well. The appeal is submitted.